UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM M. GEORGE,

                   Plaintiff,

          v.

CITY OF BUFFALO,

                  Defendant.
_____

                                 REPORT
                                 and
                   RECOMMENDATION

                           09-CV-00002A(F)

APPEARANCES:         DREW & DREW
                         Attorneys for Plaintiff
                         DEAN M. DREW,
                         ALANA P. CARR, and
                         CAROLYN NUGENT GORCZYNSKI, of Counsel
                         159 Linwood Avenue
                         Buffalo, New York  14209

                         HODGSON RUSS LLP
                         Attorneys for Defendant
                         ADAM W. PERRY,
                         JEFFREY THOMAS FIUT,
                         JOSEPH S. BROWN, and
                         MICHAEL B. RISMAN, of Counsel
                         The Guaranty Building
                         140 Pearl Street
                         Suite 100
                         Buffalo, New York  14202

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara on September 14, 2010, for all pretrial matters including preparation of a report and recommendation on dispositive motions.  The matter is presently before the court on Defendant's motion for summary judgment (Doc. No. 84), filed July 30, 2012.

**BACKGROUND**

Plaintiff William M. George ("Plaintiff" or "George"), commenced this civil rights action on January 5, 2009, alleging age discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and New York Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYHRL").  Plaintiff specifically alleged that despite being repeatedly hired since March 2001, by Defendant City of Buffalo ("Defendant" or "City"), as a Laborer II, Seasonal ("seasonal laborer"), with the City's Department of Public Works, Parks & Streets ("DPW"), Plaintiff has never been appointed to a Laborer II, Permanent position ("permanent laborer"), whereas other, younger seasonal laborers have routinely been hired to fill vacant permanent laborer positions.  On April 20, 2011, Plaintiff, with the court's permission, filed an amended complaint (Doc. No. 58) ("Amended Complaint"), asserting as a civil rights claim under 42 U.S.C. § 1983, that Defendant's failure to promote Plaintiff to a permanent laborer position was in retaliation for Plaintiff's refusal to switch his political affiliation from Independent to Democrat, and for refusing to make monetary contributions to the mayoral campaigns of Buffalo Mayor Byron W. Brown ("Mayor Brown"), in violation of Plaintiff's First Amendment right to free association.  Defendant's answer to the Amended Complaint (Doc. No. 60), was filed April 29, 2011.

On July 30, 2012, Defendant filed the instant motion for summary judgment (Doc. No. 84) ("Defendant's motion"), supported by the attached Declaration of Michael B. Risman, Esq. in Support of Summary Judgment (Doc. No. 84-1) ("Risman Declaration"), Exhs. A through O (Docs. Nos. 84-2 through 84-5) ("Defendant's Exh(s). __"), the

Affidavit of Steven J. Stepniak in Support of Summary Judgment (Doc. No. 84-6) ("Stepniak Affidavit"), the Affidavit of Dana Floriano in Support of Summary Judgment (Doc. No. 84-7) ("Floriano Affidavit"), the Affidavit of Jacqueline Barnett in Support of Summary Judgment (Doc. No. 84-8) ("Barnett Affidavit"), the Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Doc. No. 84-9) ("Defendant's Memorandum"), and Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56 (Doc. No. 84-10) ("Defendant's Statement of Facts").   On September 21, 2012, Plaintiff filed in opposition to Defendant's motion the Affidavit of Dean M. Drew, Esq. (Doc. No. 88) ("Drew Affidavit"), attaching exhibits A through S (Docs. Nos. 88-1 through 88-4) ("Plaintiff's Exh(s). __"), and also filed Plaintiff's Response to Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56 (Doc. No. 89) ("Plaintiff's Statement of Facts"), and Plaintiff's Memorandum of Law in Opposition to Summary Judgment (Doc. No. 90) ("Plaintiff's Memorandum").[1]   On October 5, 2012, Defendant filed the Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Doc. No. 93) ("Defendant's Reply"), the Reply Declaration of Michael B. Risman, Esq., in Support of Summary Judgment (Doc. No. 94) ("Risman Reply Declaration"), with attached exhibits A through H (Docs. Nos. 94-1 through 94-8) ("Defendant's Reply Exh(s). __"), and Defendant's Response to Plaintiff's Proposed Additional Undisputed Facts (Doc. No. 95) ("Defendant's Counter Statement of Facts"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be DISMISSED as moot in part, GRANTED in part, and DENIED in part.

---

[1] To correct a signature error, Plaintiff's Memorandum was refiled on September 24, 2012 as Doc. No. 92.

# FACTS[2]

Within the Department of Public Works, Parks and Streets ("DPW") in Defendant City of Buffalo ("Defendant" or "City"), there are various employment positions including, as relevant here, Laborer II positions.  Because the Laborer II position is designated as "non-competitive," no civil service examination is required for appointment; rather, appointments are discretionary.  The DPW's budget provides for 80 permanent Laborer II positions ("permanent laborers"), and 54 seasonal Laborer II positions ("seasonal laborers").  Despite performing the same work, permanent laborers are paid significantly more and receive benefits, including sick leave and vacation time, as compared to seasonal laborers who are paid less[3] and receive no benefits, and seasonal workers often must work on holidays without the benefit of receiving increased holiday wages.  Permanent laborers are required to join the union, whereas seasonal laborers are not.  To avoid being considered permanent laborers entitled to the higher wage and benefits, twice a year those employed as seasonal laborers must be laid off for one week, and then reappointed.

In March 2001, Plaintiff William M. George ("Plaintiff" or "George"), commenced employment with Defendant as a seasonal laborer, working as a garbage lifter with the Street Sanitation Crew.  As a garbage lifter, Plaintiff performs garbage removal, the duties for which include walking alongside a garbage truck or "packer," hauling garbage totes from the curb, emptying the contents into the packer, and then returning the totes to the curb.  Plaintiff maintains that ever since being appointed to the seasonal laborer position in March 2001, he has been repeatedly advised by his superiors that

---

[2] Taken from the pleadings and motion papers filed in this action.
[3] Plaintiff's hourly rate as a Laborer II (Seasonal) worker is $ 6.15.

appointments to permanent laborer positions were made on a merit-based system such that, so long as Plaintiff worked hard, he eventually would merit appointment to a permanent laborer position.  According to Plaintiff, despite working hard in the seasonal laborer position so as to be considered a good candidate for promotion to a permanent laborer position, consistently receiving positive reviews from his superiors, and being repeatedly advised he was on a list for recommendation for appointment as a permanent laborer, Plaintiff has not received the coveted appointment, yet numerous younger employees without as much experience have been promoted to the permanent laborer position.

Plaintiff also trained for, took, and passed a road test for a commercial driver's license ("CDL").  Upon obtaining his CDL, Plaintiff was eligible to take the civil service exam for appointment to a position driving a garbage truck.  Plaintiff maintains he applied for appointment to a permanent truck driver position, but was passed over in favor of younger applicants who were not as qualified because they had not received the necessary training for the position.  Accordingly, Plaintiff commenced this action on January 5, 2009, seeking relief pursuant to the ADEA.

In depositions conducted in connection with this action, Plaintiff became aware of the possibility that Plaintiff's minimal support for Buffalo Mayor Byron W. Brown ("Mayor Brown") is the real reason Plaintiff has not been appointed to a permanent laborer position.  Plaintiff is a registered member of the Independent Party, whereas both Mayor Brown and his predecessor, Anthony M. Masiello ("Mayor Masiello"), who was in office when Plaintiff's employment commenced in 2001, are Democrats.  According to Plaintiff, statements made during depositions of several City employees indicated that

with the commencement of Mayor Brown's administration, the previous tradition of

making merit-based appointments to vacant permanent laborer positions was

abandoned in favor of a system whereby appointments are dependent on one's political

affiliation and monetary support for Mayor Brown's administration.  Plaintiff recalls that

he voluntarily participated in Mayor Brown's re-election bid in 2009, by driving around a

campaign worker to collect nominating petition signatures, although Plaintiff's failure to

register as a Democrat rendered him ineligible to circulate such petitions.  Despite

Plaintiff advising he was available to further aid the campaign, Plaintiff was never

contacted for such assistance.  Plaintiff also consistently refused to make any monetary

contributions to Mayor Brown's political fundraising efforts, or to join Mayor Brown's

"Leadership Council" which is not really a council but, rather, is a fundraising

organization for which the annual dues collected are campaign donations for Mayor

Brown.  According to Plaintiff, appointments to open permanent positions were, under

Mayor Brown's administration, made from a list of financial contributors, rather than

upon merit-based referral.  Plaintiff subsequently amended his complaint alleging, under

§ 1983, employment discrimination in violation of his First Amendment right to free

association based on Defendant's failure to appoint Plaintiff to a permanent laborer

position because Plaintiff is not registered as a Democrat and does not make financial

contributions to Mayor Brown's political campaign fund.

## DISCUSSION

**1.      Summary Judgment**

Defendant argues in support of summary judgment that no evidence supports

Plaintiff's age discrimination claim, Defendant's Memorandum at 4-16, that Plaintiff's

New York Human Rights Law claim is barred by the doctrine of election of remedies, *id.*

at 16-17, that Plaintiff's First Amendment claim fails as a matter of law because Plaintiff

has not engaged in any conduct protected under the First Amendment, *id.* at 18-22,

there is no causal connection between Plaintiff's purported protected conduct and

Defendant's failure to appoint Plaintiff to a permanent laborer position, *id.* at 22-24,

Plaintiff never applied for a permanent laborer position, *id.* at 25, that even if Plaintiff

had applied for such position, the scarcity of vacancies would have prevented Plaintiff

from obtaining a position, *id.* at 25-26, and the record is devoid of any evidence that a

custom or policy of Defendant caused Plaintiff's alleged injuries.  *Id.* at 26-28.

In opposition to summary judgment, Plaintiff argues his unwillingness to engage

in political activity, as a precondition to promotion to permanent laborer, is

constitutionally protected conduct, Plaintiff's Memorandum at 16-17, that Plaintiff

suffered an adverse employment action insofar as Defendant failed to appoint Plaintiff

to a permanent laborer position, *id.* at 17-18, that the lack of any application procedure

for the permanent laborer position rendered it impossible for Plaintiff to apply for such

position, *id.* at 18-20, that the burden-shifting test used to analyze Title VII claims does

not apply to a § 1983 First Amendment discrimination claim, *id.* at 21-24, that

statements made by certain witnesses on behalf of Defendant indicate that Plaintiff

would not have been appointed to a permanent laborer position even in the absence of

any constitutionally protected activity, thereby establishing an issue of fact of pretext for discrimination, *id*. at 24-25, that Defendant's assertion that Plaintiff was actually subjected to favorable treatment by reappointing Plaintiff to the seasonal laborer position for more than ten years overlooks the question as to why Plaintiff was not, during the same period, appointed to a corresponding permanent laborer position, *id*. at 25-27, and that Defendant's assertion that Defendant was unaware of who Plaintiff is could be construed as establishing Defendant was aware only of those employees who actively supported Mayor Brown's administration and re-election efforts. *Id*. at 27. Plaintiff also withdraws his age discrimination claim. *Id*. at 27.

In further support of summary judgment, Defendant argues Plaintiff has failed to meet either element of his First Amendment claim including establishing Defendant failed to appoint Plaintiff to a permanent laborer position because of Plaintiff's political beliefs, Defendant's Reply at 1-4, and that Plaintiff's voluntary political work on behalf of Mayor Brown's campaign disproves Plaintiff's assertion that he was "apolitical." *Id*. at 5. According to Defendant, Plaintiff has failed to address the question of municipal liability, *id*. at 6, has mischaracterized the appointment process, *id*. at 7-10, and does not dispute that Plaintiff never applied for the permanent laborer position. *Id*. at 10.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be

drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322;

*see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a

material fact is "genuine," that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party").  "A fact is material if it 'might affect the

outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

    "[T]he evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination of summary judgment motions."  *Brady v. Town of

Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec.

Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes

Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Preliminarily, the court observes that Plaintiff has withdrawn his age discrimination claim alleged under Title VII and the ADEA.  Plaintiff's Memorandum at 27.  Defendant's motion is thus DISMISSED as moot with regard to such claim. Further, although not specifically asserted by Plaintiff, insofar as Plaintiff also asserted his age discrimination claim under New York Human Rights Law, N.Y. Exec. Law § 296, such claim is construed identical to an age discrimination claim under the ADEA.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999) ("since claims under the NYSHRL are analyzed identically to claims under the ADEA and Title VII, the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under the ADEA and Title VII."), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).  Nor does Plaintiff offer any argument in opposition to Defendant's argument in support of summary judgment on such claim and, as such, Plaintiff has acquiesced in Defendant's assertions.  *See Felske v. Hirschmann*, 2012 WL 716632, at * 3 (S.D.N.Y. Mar. 1, 2012) (by failing to respond to defendants' argument regarding personal jurisdiction, plaintiff effectively conceded point); *Goodwin v. Burge*, 2011 WL 2117595, at *12 (W.D.N.Y. Mar. 7, 2011) (holding plaintiff, by failing to argue in opposition to summary judgment on a claim for relief, effectively conceded to defendant's assertions establishing there was no factual basis for asserting the claim against such defendant); *Gonzalez v. City of Schenectady*, 2001 WL 1217224, at * 11 (N.D.N.Y. Sept. 17, 2001) (deeming defendants, by failing to present a position on one plaintiff's motion to sever his claim from those of the other

plaintiffs, acquiesced in the relief sought).  Accordingly, Defendant's motion should be

GRANTED insofar as Plaintiff's age discrimination claim is asserted under N.Y. Exec.

Law § 296.

Similarly, inasmuch as Plaintiff originally based his employment discrimination

claim on Defendant's failure to appoint Plaintiff, who had obtained his CDL, to a

provisional truck driver position, whereas not everyone appointed to such position

possessed a CDL, yet were younger and had provided political support to Mayor Brown,

Amended Complaint ¶¶ 26-27, Defendant maintains the collective bargaining

agreement between the City and AFSCME Local 264 Bargaining Unit ("the Union"),

provided that vacant provisional truck driver positions could only be filled by Union

members.  Risman Declaration ¶ 6.  Because Plaintiff is not a Union member, Plaintiff is

not eligible for such appointment.  *Id.* ¶ 7.  Plaintiff offers nothing in opposition to this

argument point and, as such, has acquiesced in it.  *Felske*, 2012 WL 716632, at * 3;

*Goodwin*, 2011 WL 2117595, at *12; and *Gonzalez*, 2001 WL 1217224, at * 11.

Accordingly, summary judgment on this aspect of Plaintiff's claim is GRANTED, leaving

only Plaintiff's First Amendment claim to be addressed.


**2.      42 U.S.C. § 1983**

Insofar as Defendant is alleged to have violated Plaintiff's civil rights, pursuant to

42 U.S.C. § 1983, an individual may seek damages against any person who, under

color of state law, subjects such individual to the deprivation of any rights, privileges, or

immunities protected by the Constitution or laws of the United States.  42 U.S.C. §

1983.  Section 1983, "allows an action against a 'person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983).  Section 1983, however, "'is not itself a source of substantive rights.'"  *Patterson*, 375 F.3d at 225 (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'. . . ."  *Id.*  The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, and (2) by a person acting under color of state law.  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (citing *Gomez v. Taylor*, 466 U.S. 635, 640 (1980)).  Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed."  *Id.*  (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and *Baker*, 443 U.S. at 140).

Here, Plaintiff alleges Defendant discriminated against him by refusing to appoint Plaintiff to a permanent laborer position because of Plaintiff's failure to register as a Democrat and to adequately support Mayor Brown's administration and re-election efforts, in violation of the First Amendment's free association provision.  Plaintiff has thus established the first element of § 1983 claim.  With regard to the second step, Defendant argues that, in the absence of any evidence that any municipal policy or custom caused Plaintiff's alleged injury, Plaintiff's failure to name a City official or employee as a defendant to this action requires its dismissal under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 691 (1978).  Defendant's Memorandum at 26-28.  In opposition, Plaintiff maintains that Mayor Brown "is the

'principal policy maker'" as contemplated by *Monell*.  Plaintiff's Memorandum at 9.  In

further support of summary judgment, Defendant argues Plaintiff's passing reference to

Mayor Brown as the municipal policymaker is insufficient to establish the City can be

held vicariously liable for Plaintiff's alleged injuries.  Defendant's Reply Memorandum at

6.

Preliminarily, the court observes that despite Plaintiff's scant response to

Defendant's argument on this point, Plaintiff has not conceded the point and, as such,

has not abandoned his First Amendment retaliation claim.  *See Taylor v. City of New*

*York*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim

abandoned when a party moves for summary judgment on one ground and the party

opposing summary judgment fails to address the argument *in any way.*" (italics added));

*Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998) (where

plaintiff's opposition papers "never even mention [ ] any retaliation claim in his brief *or*

*affidavits* . . . the Court deems all of the remaining claims in the complaint to be

abandoned, and recommends that defendants be granted summary judgment

dismissing these claims." (italics added)).  Turning to the merits of Defendant's

argument that Plaintiff's First Amendment retaliation claim, alleged only against the City,

must be dismissed for want of evidence that a municipal policy or custom caused

Plaintiff's alleged injury, genuine issues of material fact preclude summary judgment on

this basis.

Specifically, generally "a municipality cannot be held liable under § 1983 on a

*respondeat superior* theory."  *Monell*, 436 U.S. at 691.  To establish municipal liability

under § 1983, a plaintiff must prove that "policies or customs that [were] sanctioned" by

the municipality led to the alleged constitutional violation.  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694).  To avoid summary judgment on this ground, evidence in the record must establish a genuine issue of fact as to whether the alleged constitutional violation occurred pursuant to either a formal course of action officially promulgated by the municipality's governing authority, or the act of a person with policymaking authority for the municipality.  *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly," although "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Pembaur*, 475 U.S. at 483.  In the instant case, there is evidence in the record on which a reasonable jury could find that the City's failure to appoint Plaintiff to a permanent laborer position occurred pursuant to a policy promulgated by either Mayor Brown or First Deputy Mayor Steven Casey ("Casey"), that appointments to permanent laborer positions will be granted only to those registered as Democrats or who sufficiently supported Mayor Brown's political campaign efforts.

In particular, Defendant relies on statements by former Superintendent of Streets and Sanitation Robert Battaglia ("Battaglia"), as confirming that permanent laborer appointments are based on merit, rather than politics.  Defendant's Memorandum at 27

(citing Battaglia Affidavit[4] ¶ 5).  As relevant, Battaglia explains that while working in his superintendent position, from which Battaglia retired in July 2007, Battaglia Affidavit ¶ 1, "[u]sually, but not always, the D[PW] awarded the permanent appointment to the seasonal employee with the greatest length of service and best work record . . . ."  *Id.* ¶ 5.  According to Defendant, Plaintiff gave deposition testimony agreeing with Battaglia's statement, acknowledging appointments to permanent positions were usually made based on length of service and work record, rather than politics.  Defendant's Memorandum at 27 (citing Plaintiff's Dep. Tr.[5] at 116-18).  Defendant further maintains there is no evidence of a municipal policy, that Mayor Brown was aware of Plaintiff's political beliefs, or even knew who Plaintiff was.  Defendant's Memorandum at 27-28.  Defendant's arguments, however, fail to establish the absence of any issue of fact supporting support summary judgment on this ground.

Specifically, Battaglia's statement that appointments to permanent positions are usually awarded to the seasonal employee with the longest service and best work record, Battaglia Affidavit ¶ 5, is contradicted by Charles Masi ("Masi"), who, at all times relevant to this action, was employed as Administrator of the City's DPW.  In particular, Masi gave deposition testimony indicating that prior to Mayor Brown's tenure as mayor, Masi was extensively involved in the hiring process for the DPW, including those hired as permanent laborers, the position sought by Plaintiff, but after Brown's inauguration, Masi was essentially excluded from the process, at which time employment decisions

---

[4]  Filed as Defendant's Exh. O.
[5]  References to "Plaintiff's Dep. Tr. __" are to the page of the transcript of Plaintiff's deposition, filed as Defendant's Exh. L.

were made by First Deputy Mayor Casey.  Masi June 9, 2010 Dep. Tr. [6] at 13-14.  Masi

also provided answers to Plaintiff's Interrogatories  including Interrogatories 9 and 12,

inquiring as to the steps and criteria for the selection process for appointment to the

permanent laborer position, responding that it is "the custom of the Mayor's Office to

identify[ ] individuals that they wish to see hired."  Masi's Answers to Plaintiff's

Interrogatories[7] Nos. 9 and 12.[8]  Masi also gave deposition testimony that hiring

decisions were made "*by direction of the mayor's office.*"  Masi June 9, 2010 Dep. Tr. at

91 (italics added).

The ambiguity created by the different explanations given by Battaglia and Masi

regarding the process by which appointments to permanent positions, especially Masi's

attributing the selection of such candidates to the Mayor's Office, establishes the

existence of an issue of fact as to whether such appointments were made pursuant to a

policy created by the Mayor's Office to favor candidates who were active on behalf of

Democratic candidates, and especially supportive of Mayor Brown.  Summary judgment

based on Plaintiff's failure to name a City official or employee as a defendant to this

action should thus be DENIED.

Accordingly, the court next addresses the merits of such claim.


3.      **First Amendment Retaliation**

With regard to Plaintiff's § 1983 First Amendment employment discrimination

claim, it is settled that "'[p]ublic employees do not surrender their First Amendment

---

[6]  References to "Masi June 9, 2010 Dep. Tr." are to pages of the transcript of the deposition testimony given by Masi on June 9, 2010, for which a copy of the relevant portions is filed as Plaintiff's Exh. F, and Defendant's Reply Exh. E.
[7]  A copy of the relevant Plaintiff's Interrogatories is filed as Plaintiff's Exh. N.
[8]  A copy of Masi's Answers to Plaintiff's Interrogatories Nos. 9 and 12 is filed as Plaintiff's Exh. O.

rights to comment on matters of public interest by virtue of their acceptance of government employment.'" *Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) (quoting *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968))). "Generally, a public employee is protected from adverse employment decisions based upon the employee's exercise of his First Amendment rights." *Coogan v. Smyers*, 134 F.3d 479, 483 (2d Cir. 1998) (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75-76 (1990), and *Pickering*, 391 U.S. at 568). "Political patronage or party affiliation are impermissible reasons for dismissing government employees absent a showing that 'party affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Coogan*, 134 F.3d at 483 (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980), and citing *Rutan*, 497 U.S. at 74-76, and *Elrod v. Burns*, 427 U.S. 347, 372-73 (1976)). "The rule has been extended to promotion, . . . and hiring decisions based on party affiliation . . . ." *Id.* at 484 (citing *Rutan*, 497 U.S. at 79). "'[P]olitical belief and association constitute the core of those activities protected by the First Amendment.'" *Rutan*, 497 U.S. at 69 (quoting *Elrod*, 427 U.S. at 356). "[C]onditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association . . . [because it] pressures employees to pledge political allegiance to a party with which they prefer not to associate, to work for the election of political candidates they do not support, and to contribute money to be used to further policies with which they do not agree, . . . [which is] tantamount to coerced belief." *Rutan*, 497 U.S. at 69 (citing *Elrod*, 427 U.S. at 351, 355, and 359).

In a First Amendment retaliation action, the plaintiff "has the initial burden of showing that an improper motive played a substantial part in defendant's action."  *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003) (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977)).  "The burden then shifts to defendants to show it would have taken exactly the same action absent the improper motive.  *Id*.  "Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred."  *Id*. at 287-88.  Further, unlike the burden-shifting framework relevant to an employment discrimination claim pursuant to Title VII, once the defendant establishes a proper motive supported the adverse employment action, the burden does not shift back to the plaintiff to show such motive was mere pretext.   *See Deep v. Coin*, 453 Fed. Appx. 49, 55 (2d Cir. Dec. 19, 2011) (denying defendant employer's motion for a new trial in § 1983 employment discrimination action based on district court's refusal to give a pretext charge because "unlike the traditional burden-shifting framework [applied in Title VII cases],[9] we have never identified pretext as a relevant factor in considering a First Amendment retaliation claim . . . ." (internal citations omitted)).

**4.**     ***Prima Facie* Case**

With regard to Plaintiff's initial burden, a successful First Amendment retaliation claim under § 1983 requires three elements including that (1) the conduct at issue was constitutionally protected, (2) Plaintiff suffered an adverse employment action, and (3) a causal relationship between the constitutionally protected conduct and the adverse

---

[9] Unless otherwise indicated, all bracketed text is added.

employment action.  *See Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008)

(First Amendment claim alleging retaliation based on free speech).  In the instant case,

that Plaintiff was never appointed to a permanent laborer position is not disputed.

Because the failure to hire or promote constitutes an adverse employment action, *Zelnik*

*v. Fashion Institute of Technology*, 464 F.3d 217, 226 (2d Cir. 2006) (considering in the

context of a First Amendment retaliation claim that "adverse employment actions

include discharge, *refusal to hire*, *refusal to promote*, demotion, reduction in pay, and

reprimand" (internal citation and quotation omitted; italics added)), the second element

is not at issue and will not be further discussed.  As such, only the first and third

elements need be addressed.


### A.      Constitutionally Protected Activity

Here, Defendant maintains Plaintiff has not demonstrated that he was engaged

in any constitutionally protected conduct because Plaintiff is apolitical and was never

pressured to become politically active.  Defendant's Memorandum at 18.  In support of

this argument, Defendant points to statements made by Plaintiff at his deposition that

Plaintiff (1) was never asked to do political work including working on Mayor Brown's re-

election campaign, Plaintiff's Dep. Tr. at 175, 241-42; (2) never advised anyone within

Mayor Brown's administration of his personal "moral code" that Plaintiff did not believe

in doing political work in exchange for favors, *id*. at 196-97; (3) never assisted any

political opponents or rivals of Mayor Brown, *id*. at 62, 215-16; (4) had only voted twice

in the last twenty years, *id*. at 55; and (5) has never belonged to a political club, *id*. at

58.  Defendant's Memorandum at 19.  Defendant further asserts that Plaintiff actually

engaged in conduct inconsistent with Plaintiff's asserted apolitical stance, including voluntarily assisting with Mayor Brown's 2009 re-election effort. *Id.* at 19-20 (citing Plaintiff's Dep. Tr. at 172-75). Because Plaintiff was not a registered Democrat, Plaintiff was not allowed to circulate nominating petitions for signatures but, instead, was assigned to drive a campaign staffer from house to house to obtain petition signatures, an experience which Plaintiff apparently enjoyed because he described it as "***fun***." *Id.* at 19-20 (bold, italics, and underlining in original, and citing Plaintiff's Dep. Tr. at 172-75). Plaintiff gave the campaign staffer his telephone number and requested the staffer to call him if more help was needed. *Id.* at 20 (citing Plaintiff's Dep. Tr. at 174-75). The staffer did call Plaintiff once to request additional help, but Plaintiff was unavailable, and Plaintiff was not contacted again to assist with the campaign. *Id.* (citing Plaintiff's Dep. Tr. at 175, 226-27). On another occasion, Plaintiff handed out flyers promoting Mayor Brown's re-election, *id.* (citing Plaintiff's Dep. Tr. at 58), and also volunteered on behalf of Democrat James Keane's 2007 campaign for Erie County Executive. *Id.* (citing Plaintiff's Dep. Tr. at 181. Defendant maintains Plaintiff's deposition testimony regarding Plaintiff's conversation, in the Fall of 2009, with DPW supervisor Paul Sullivan ("Sullivan"), establishes that Sullivan never advised Plaintiff to change his political affiliation to Democrat to obtain an appointment to a permanent position, but only discussed politics in the context of circulating nominating petitions. *Id.* at 21-22 (citing Plaintiff's Dep. Tr. at 158-60). Defendant maintains that Plaintiff's own deposition testimony thus belies Plaintiff's assertion that he was involved in any constitutionally protected activity. *Id.* at 22.

Although Plaintiff does not dispute that he initiated the conversation with Sullivan, or that the conversation was limited to the requirement that only registered Democrats were allowed to circulate nominating petitions, Plaintiff's Statement of Facts ¶¶ 60-66, Defendant's argument nevertheless overlooks the fact that even a plaintiff who offers support for the political party in charge may suffer adverse employment consequences if such support is not considered sufficient. *See Morin v. Tormey*, 626 F.3d 40, 44 (2d Cir. 2010) ("The right to be free from retaliation based on political affiliation is not limited to members of an opposing political party, but extends to those who are perceived by those retaliating to be apolitical or *insufficiently politically loyal*." (italics added)). In *Morin*, the plaintiff, former chief clerk of county family court, commenced a § 1983 action against various judges and county employees alleging violations of her First Amendment right to free speech when, after refusing the defendants' requests that she engage in partisan political activities, the plaintiff was demoted. *Id*. at 41-43. Although the defendants argued the case was without merit because the plaintiff did not allege any adverse employment action attributed to the plaintiff's expression of political views, the court found the plaintiff's suit asserted her First Amendment right not to be pressured into participating in partisan political activities. *Id*. at 44.

Similarly, the evidence in the instant case that although Plaintiff did not express any political views, engaged in some limited activity with regard to Mayor Brown's re-election efforts, and supported James Keane's 2007 bid for Erie County Executive, Plaintiff's failure to register as a Democrat, which would have permitted Plaintiff to engage in more political activities on behalf of the Democrat party, including circulating nominating petitions, as well Plaintiff's refusal to make any financial contribution to

any candidate, including Mayor Brown's Leadership Council, described by Defendant's witnesses as Mayor Brown's ongoing campaign fund, could be construed as exhibiting insufficient loyalty to Mayor Brown's administration and the Democratic party.

Nor is Plaintiff's description of his experience driving around another volunteer to obtain signatures on nominating petitions for Mayor Brown's second mayoral campaign as "***fun***," Defendant's Memorandum at 2 and 21; Risman Declaration ¶ 76 (underlining, bold, and italics in originals), relevant, let alone dispositive, as to whether Plaintiff was considered sufficiently loyal to Mayor Brown's administration.  A reasonable jury could construe such fact as indicating Plaintiff merely enjoyed the company of the other campaign workers and was oblivious that his limited involvement with such campaign activities was interpreted by Defendant as refusing to sufficiently engage in expected political activity required to further Plaintiff's career.  Significantly, Defendant does not contend there is any correlation between the amount of "***fun***" Plaintiff had driving around another campaign worker for a couple of hours and the sufficiency of Plaintiff's support for the campaign.

Evidence in the record thus establishes an issue of fact as to the first element of a First Amendment retaliation claim insofar as Plaintiff engaged in constitutionally protected activity by refusing to register as a Democrat and refusing to make financial contributions to Mayor Brown's political campaign.  Because it is undisputed that Plaintiff, as a result of Defendant's failure to appoint Plaintiff to a permanent laborer position, suffered an adverse employment action, the second element of a First Amendment retaliation claim, the court thus turns to whether there is evidence in the record on which a reasonable jury could find the third element of the claim, *i.e.*, a causal

connection between Plaintiff's constitutionally protected conduct and the adverse employment action.

**B.    Causal Relationship**

With regard to the third element, the record contains a plethora of evidence establishing factual issues on which a reasonable jury could find Plaintiff's refusal to register as a Democrat and make financial contributions or donations to Mayor Brown's political campaign fund was a motivating factor in Defendant's decision not to appoint Plaintiff to a permanent laborer position.

In particular, Masi, as Administrator of the City's DPW, made statements in response to Plaintiff's Interrogatories, and gave deposition testimony indicating that prior to Mayor Brown's tenure as mayor, Masi was extensively involved in the hiring process for the DPW, including those hired as permanent laborers, the position sought by Plaintiff, but after Brown's inauguration, Masi was essentially excluded from the process, at which time employment decisions were made by First Deputy Mayor Casey. Specifically, in response to Plaintiff's Interrogatories 9 and 12, inquiring as to the steps and criteria for the selection process for appointment to the permanent laborer position, Masi responded that because the City is not contractually obligated to post non-competitive positions, "*it has been the custom of the Mayor's Office to identify[ ] individuals that they wish to see hired.  That individuals [sic] name is provided to this department [DPW] for processing.  I do not nor am I privileged to that selection process.*"  Masi's Answers to Plaintiff's Interrogatories Nos. 9 and 12 (italics added).

Although Masi represented that he had no knowledge of, or input into, the selection process, on April 21, 2010, Assistant Corporation Counsel Robert E. Quinn ("Quinn"), provided a supplemental interrogatory response that "Mr. Masi is the individual agent of the City of Buffalo best able to answer these Interrogatories numbered "9", "10", and "12". Defendant's Supplemental Interrogatory Answers[10] at 3.

Consistent with his answers to Plaintiff's Interrogatories Nos. 9 and 12, Masi testified at his June 9, 2010 deposition that prior to the administration of Mayor Brown, Masi was more involved with the hiring process of employees in the DPW. Masi June 9, 2010 Dep. Tr. at 13. As Masi explained,

> Prior to [Mayor Brown's] administration taking office in January, 2006, my involvement with the hiring process was more involved than it has been. During the last [Mayor Masiello's] administration, I had input into the potential hiring of individuals. I would sit with a representative of the mayor's office, review existing personnel files with them. Although they made the final decision as to who would be hired, a lot of the information they used to base that decision was generally discussed with me and then I would be asked for a recommendation. Since the current [Mayor Brown's] administration took office, *I have been excluded from any participation to that degree or any degree whatsoever regarding the selection of the candidates for any permanent position. I offer no recommendations.* I'm asked for none although I am from time to time asked about individual's time and attendance and whether an individual has had previous disciplinary problems, but that is only a question that's put to me. I respond to those questions. I generally don't hear anything else.

Masi June 9, 2010 Dep. Tr. at 13-14 (italics added).

Masi explained that prior to January 1, 2006, in his relationship with the Mayor's Office, he "had a lot of input into who was actually hired and why . . ," *id.* at 103, and even, on one occasion, nominated a person to fill a vacant position. *Id.* After Mayor Brown assumed office, however, Masi was not permitted to make any recommendations, *id.*, nor was Masi aware of the criteria used by Mayor Brown in making appointments, *id.* at

---

[10] A copy of Defendant's Supplemental Interrogatory Answers is filed as Plaintiff's Exh. P.

55, although Masi sometime was asked to provide time and attendance records which Masi believed "may have influenced someone's non-appointment." *Id.* at 55-56. Masi, however, repeated that he was provided with names of candidates for vacant positions within the DPW by the Mayor's Office, which Masi would forward to his assistant who would advise the candidate of the recommendation for employment, after which the candidate would present to Masi's office to receive a nominating letter, which the candidate would then provide to the civil service department. *Id.* at 56. After delivering the nominating letter to the Civil Service department, the candidate was given an application to complete. *Id.* Masi reiterated that there was no written policy for a seasonal laborer to follow in seeking permanent employment. *Id.* at 83. Although Masi admitted having received a written recommendation that Plaintiff be considered for a permanent laborer position, Masi explained that he forwards all such recommendations to the mayor's office because Masi did not make hiring decisions; rather, such decisions were made "by direction of the mayor's office." *Id.* at 91. Masi testified that he never received any response from the Mayor's Office regarding the recommendation Masi forwarded that Plaintiff be hired for a permanent laborer position. *Id.* at 92.

Masi refused to answer a question regarding whether he believed hiring decisions made during Mayor Brown's administration were based on politics, invoking the Fifth Amendment privilege against self-incrimination. Masi June 9, 2010 Dep. Tr. at 102-03 (refusing to expand on his answer to the question that if the DPW commissioner Stepniak received, from somewhere other than Mayor Brown's office, a request to consider someone for employment, Stepniak would not necessarily share that information with Masi, stating he was "uncomfortable answering the question," because

he was "concerned about self-incrimination and retaliation if I answer this question," and further clarifying that Masi's objection was based on the Fifth Amendment).  When asked again whether it was Masi's position that Masi had "no insight into why the mayor's office decides to appoint any particular individual for employment in the streets department," *id.* at 106, Masi responded "Again, I'm not comfortable answering these types of questions.  They approach political issues I do not want to be responsible for dealing with."  *Id.*  When pressed as to whether it is "a common opinion" among city administrators that Mayor Brown "hires employees for political reasons," *id.* at 106-07, Masi responded "Again, I'm not going to answer the question because I'm not comfortable with responding to that."  *Id.* at 107.  Masi later admitted that political association was a commonly-held belief "among some individuals" as one of the criteria by which appointments to vacant employment positions are made, although Masi did not specifically state he shared such belief.  *Id.* at 108-09.

Masi left his job as DPW Administrator when he retired from the City in 2010. After retiring, Masi submitted to a supplemental deposition on December 16, 2011, at which Masi explained why he invoked the Fifth Amendment at his earlier deposition, stating

> I misspoke at that time.  I'm recanting that statement.  I did not take the Fifth because I have any concerns about anything illegal or immoral.  I was concerned more about my continued employment with the City of Buffalo and how it would affect me departmentally.

Masi Dec. 16, 2011 Dep. Tr. [11] at 20.

---

[11]  References to "Masi Dec. 16, 2011 Dep. Tr." are to pages of the transcript of the deposition testimony given by Masi on December 16, 2011, for which a copy of the relevant portions is filed as Plaintiff's Exh. G, and Defendant's Reply Exh. E.

In response to further questioning, Masi explained that although his former DPW administrator position was a civil service position, he held the position "on a provisional basis," and "could be removed with a ten day notice," after which Masi would have reverted to his former "permanent Civil Service title of assistant administrator," with a $ 13,000 decrease in salary.  *Id.* at 20-21.  Masi further explained his concerns about "ramifications" his testimony could have on his then supervisor, Stepniak, including that Masi's statements could cause Stepniak "displeasure" resulting in "hard feelings" between Masi and Stepniak.  *Id.* at 21-22.

Masi's statements in response to Plaintiff's Interrogatories and at his depositions raise a question as to why Masi's opinion on hiring decisions was no longer sought after Mayor Brown's inauguration, and whether Masi's opinion was considered less critical to the hiring process than a candidate's political affiliation and financial support of Brown's administration.  Deposition testimony by Olivia Licata ("Licata"), then Administrative Director, City of Buffalo Department of Human Resources ("HR"), and Dana Bobinchek Floriano ("Floriano"), then Special Assistant to the Mayor II ("Special Assistant"), similarly raises questions as to the criteria for hiring decisions, suggesting the possibility that one's political affiliation and participation in Mayor Brown's political campaign were crucial.

Specifically, Licata testified at her deposition that after a personnel specialist received a "nominating letter" from the DPW nominating a candidate for appointment to an employment position, the specialist would review the candidate's employment application folder to assess the applicant's qualification for employment, and then

prepare an "approval letter" for Licata's signature.  Licata Dep. Tr.[12] at 76.  The

qualification review included a police background check for criminal history, checking for

disqualifying physical or mental conditions, and city residency where relevant.  *Id.*  Upon

receiving the folder and approval letter, Licata would peruse the folder to make sure it

was appropriate to sign the approval letter, and the signed approval letter was then sent

to the relevant department, thereby advising the department the applicant was approved

and qualified for employment.  *Id.*  According to Licata, HR worked with the Mayor's

Office in determining whether or not an applicant was qualified for an appointment.  *Id.*

at 80.

Similarly, Floriano testified that while working as Special Assistant since the

commencement of Mayor Brown's first term in January 2006 until October 2011, she

was responsible for acting "in a confidential manner to the mayor and first deputy mayor

on issues of importance to the mayor's office," tracking and reviewing both incoming

and outgoing communications and relevant documents, directing communications and

documents to other departments for review and recommendation, and serving as "the

liaison between the mayor's office and the departments on employment matters

including Civil Service staffing."   Floriano Dep. Tr.[13] at 8, 13, 16, 19.  Prior to being

appointed as Mayor Brown's Special Assistant, Floriano had worked as a project

coordinator for Brown when Brown was a New York State Senator, and as campaign

treasurer on Brown's first mayoral campaign in 2005.  *Id.* at 18, 21, 22.  Floriano

---

[12] References to "Licata Dep. Tr." are to pages of the transcript of Licata's deposition, for which a copy of relevant portions is filed as Plaintiff's Exh. D.
[13] References to "Floriano Dep. Tr." are to pages of the transcript of Floriano's deposition, for which a copy of relevant portions is filed as Plaintiff's Exh. H, and as Defendant's Reply Exh. C.

testified she had contributed $ 50 to $ 100 to Brown's first mayoral campaign, and after

Brown was elected mayor, Floriano continued to make annual donations of $ 250 to

$ 500 to Brown's Leadership Council, which Floriano described as Brown's campaign

fund, until Floriano left the Special Assistant position for a position with the Buffalo

School District. *Id.* at 12-13, 21-22, 25-26. Floriano clarified that despite its name, the

Leadership Council never assembled nor provided any guidance or leadership to Mayor

Brown. *Id.* at 79-80. Floriano explained that although the campaign contributions were

not required for her to keep her employment position as Special Assistant to Mayor

Brown, First Deputy Mayor Casey had "suggested" that "[y]ou're going to the party,

right? You have to pay to go to the party, you know." *Id.* at 26-27. Floriano described

the contributions to Brown's Leadership Council as "a campaign function. . . ," *id.*,

specifically, "it's simply a conduit for political contributions. . . ." *Id.* at 80. Although

Floriano did not consider campaign contributions as a cost of obtaining or keeping her

job, she described the contributions as "an assumption" and "an informal expectation"

on the part of Mayor Brown and Casey. *Id.* at 28-29.

    In addition to describing the Leadership Council as Mayor Brown's "campaign

account," Floriano explained the Leadership Council was registered in Albany and had

only one officer, treasurer, a position held by Floriano from 2006 to 2008. Floriano Dep.

Tr. at 72-73. Invitations to join the Leadership Council were mailed to those on a list

Floriano compiled from a list of individuals who had previously contributed to the

campaign fund or to other campaigns, and public lists of City executives and their staff.

*Id.* at 74-77. Although the invitations were not the same from year to year, they were

similar, presenting invitees with the opportunity for "Gold Membership" upon making a

"political contribution" of $ 500, which could be paid in one, two, three or four scheduled equal installments.  *Id.* at 74-75; *see also* Plaintiff's Exh. R (copies of Leadership Council invitations for the years 2010 and 2011).  While serving as treasurer of the Leadership Council, Floriano maintained a list of approximately 100 Leadership Council members on a laptop computer, owned by the Leadership Council, yet physically maintained either at Floriano's personal residence or at Mayor Brown's office.  Floriano Dep. Tr. at 75-76.  As treasurer, it was Floriano's responsibility to file annually with the Board of Elections records of the Leadership Council's membership, which information Floriano also provided more frequently to Casey and Mayor Brown.  *Id.* at 79.  Floriano testified that during her lunch hour, she would accompany Casey to off-site locations, often a law firm's conference room, where Casey would make telephone calls inviting people to join the Leadership Council.  *Id.* at 79-80.  When Floriano's tenure as treasurer ended in 2008, she returned the computer to the Leadership Council.  *Id.* at 77.

With regard to appointments to vacant employment positions within the City, Floriano testified that "many" recommendations for filling vacant positions would come from the department with the vacancy.  Floriano Dep. Tr. at 84.  Floriano specifically stated there was no application to be completed by a seasonal laborer seeking appointment to a permanent laborer position, *id.*, describing HR's involvement in the appointment process as limited to sending a letter to the relevant department stating whether or not the prospective employee was approved for hiring.  *Id.* at 84-85.

As such, the deposition testimony of both Licata and Floriano raise questions as to the weight afforded a candidate's political affiliation and financial contributions in

discerning among candidates for vacant employment positions.  Additional testimony given by Mayor Brown and Stepniak establish issues of fact as to whether the criteria for obtaining an appointment to a permanent laborer position included one's political affiliation and financial contributions to Mayor Brown's political campaign.  Significantly, both Brown and Stepniak gave deposition testimony that places most of the responsibility for hiring decisions on Masi which, as discussed above, Discussion, *supra*, at 24, Masi denied having after Mayor Brown took office.

At his deposition, Mayor Brown testified that prior to his tenure as mayor, the City did not have an employee handbook, but one was created under Brown's first administration.  Mayor Brown Dep. Tr.[14] at 20.  Before being hired as First Deputy Mayor, Casey had financially contributed to and worked on Brown's political campaigns for Mayor and the state senate.  *Id.* at 32.  Mayor Brown admitted Casey was his "chief political advisor," *id.*, and had authority over Floriano until she left the Special Assistant position, and then over Floriano's replacement, Jessica Maglietto-Smith ("Maglietto-Smith").  *Id.* at 33.  When asked, Brown stated he was not aware whether Maglietto-Smith had contributed to Brown's first mayoral campaign, but when asked whether Maglietto-Smith had contributed to Brown's second mayoral campaign, Brown responded, "I would think so, yes."  *Id.* at 34.  Mayor Brown admitted that "many times" he directed Floriano to forward names of people Brown wished to see hired in the DPW to Masi or Stepniak.  *Id.* at 36.  Brown maintained that after Floriano reviewed the candidates, the names would then be forwarded to the DPW where the candidates would be interviewed and the successful candidate selected by whoever the DPW

---

[14] References to "Mayor Brown Dep. Tr." are to the pages of the transcript of Mayor Brown's deposition, relevant portions of which are filed as Defendant's Exh. M, Plaintiff's Exh. I , and Defendant's Reply Exh. D.

Commissioner had deemed manager of such duties.  *Id.* at 37-38.  It was Mayor

Brown's belief that Masi held such authority in the DPW.  *Id.* at 38.  According to Brown,

the recommendation that a particular candidate be hired would be made by the DPW to

the City's Human Resources Department ("HR"), *id.* at 39-40, although sometimes the

recommendation would be directed to the Mayor's Office.  *Id.* at 40-41.  Mayor Brown,

when asked whether, upon receiving such a recommendation, the Mayor's Office would

ever make the determination whether to hire the candidate, at first responded, "I don't

know," *id.* at 41, before clarifying that "There might be times when I would certainly look

at it, yes."  *Id.*  Brown, however, denied that he would actually make decisions regarding

who to hire, yet Casey would have had such authority.  *Id.* at 41-45.

        In particular, according to Mayor Brown, Casey, as First Deputy Mayor, had

authority to hire and fire City employees.  Brown Dep. Tr. at 45.  Although Casey did not

directly hire and fire "labor-level employees" in the DPW, whenever a recommendation

for appointment was made, Casey would make sure the recommended employee was

interviewed, appropriate background checks were completed, "and that the department

did everything to make sure they had thoroughly looked into the candidate's background

to make sure that someone was not being hired that could be a bad worker for the

administration."  *Id.*  Brown continued that Casey's review would ensure the prescribed

rules for the hiring process, including "looking into candidates' backgrounds" were

followed.  *Id.*  Brown described the source of candidates nominated for the DPW as

including "people that applied on the second floor outside of the Mayor's Office," "people

who applied from the Human Resources Department," "people who mailed their

credentials in to the Mayor's Office," coming "from an elected official," "a block club

president," "a community member," the Mayor himself, "from Mr. Casey, or actually, from someone who worked in the department, or someone who was a manager in the department." *Id.* at 46. Mayor Brown explained that when a recommendation for hire came from the DPW, the procedure within the Mayor's Office was first to check for budgetary considerations to ensure there were sufficient funds in the budget for the position. *Id.* at 49-50. Mayor Brown described the First Deputy Mayor position as "the chief of staff" who was "definitely very involved in looking at the budgetary implications of all hiring." *Id.* at 52. Mayor Brown was unaware whether there were written procedures for considering those who were recommended for hire, other than some positions required "background checks." *Id.* at 52-53.

DPW Commissioner Stepniak testified that Masi was the administrator for the DPW, Stepniak Dep. Tr.[15] at 7, but admitted being "somewhat familiar" with the requirements for promotions and hiring, which were "HR and civil service matter[s]." *Id.* at 12. According to Stepniak, there was no formal evaluation process for selecting candidates for promotion or hire other than following applicable civil service rules. *Id.* at 13. Stepniak admitted being "familiar with criteria used in the selection process for promotion or hire" to the permanent laborer position sought by Plaintiff. *Id.* Stepniak testified that he did not know anything about Plaintiff until approximately one month before Stepniak's May 6, 2010 deposition, when he learned about Plaintiff from Masi whom Stepniak had assigned to provide responses to interrogatories which Stepniak considered an "HR" issue. *Id.* at 33-34.

---

[15] References to "Stepniak Dep. Tr." are to the pages of the transcript of the deposition of Stepniak, the relevant portions of which are filed as Plaintiff's Exh. E and Defendant's Reply Exh. B.

Case 1:09-cv-00002-MAT-LGF   Document 97   Filed 01/09/14   Page 34 of 43

In response to questions as to how to obtain an appointment to the permanent laborer position sought by Plaintiff, Stepniak testified there was an "[i]nformal process of conversations with department head [Masi]. [Masi] - - involved with time and attendance issues and the Mayor's office is involved in those conversations." Stepniak Dep. Tr. at 36. Stepniak explained that Floriano, on behalf of the Mayor's Office, would inquire of Masi as to a candidate's time, attendance, and job performance. *Id.* Masi, upon receiving notification from the Mayor's Office of an impending appointment, would forward the necessary paperwork, including letters of nomination signed by Masi, to the Civil Service office. *Id.* at 40. Stepniak, in contrast to Masi's deposition testimony, testified that Masi was involved with a formal process for considering candidates for permanent positions, including meeting with Stepniak, the Mayor's Office, and the recommended candidates. *Id.* at 50. Stepniak stated he would receive an e-mail whenever there was a new hire for DPW, and estimated there where 20 hires in the DPW each year.[16]  *Id.* at 57.

The stark contrast between the deposition testimony given by Masi, Licata, and Floriano, which indicate that final hiring decision are made by Casey and Brown, and the deposition testimony given by Mayor Brown and Stepniak, in which the question as to who is responsible for final hiring decisions is, at best, skirted, and otherwise placed on Masi, creates an ambiguity that must be construed in Plaintiff's favor, precluding summary judgment. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) ("In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of

---

[16] The portions of Stepniak's deposition transcript do not indicate whether Stepniak was asked if political support for Mayor Brown was a factor considered in making appointments to permanent positions.

the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." (internal citation omitted)).

Moreover, former Superintendent of Streets and Sanitation Battaglia's statements further call into question the hiring process used during Brown's administration.  In particular, Battaglia states that in his supervisor position he "supervised permanent and seasonal laborers employed by the Department of Public Works, including William George."  Battaglia Affidavit ¶ 2.  Plaintiff worked under Battaglia's supervision from 2001 until Battaglia retired in 2007, *id.* ¶ 3, during which time Plaintiff "maintained an excellent record of attendance and was a model employee . . . [and] rarely, if ever, took personal or vacation time and often attended work when he, or members of his family, were sick."  *Id.* ¶ 7.  According to Battaglia, the DPW maintained a list of seasonal employees, with their hire dates, and whenever a permanent position became available in the DPW, the seasonal laborers were encouraged to apply.  *Id.* ¶ 5.  Specifically, "[w]hen a permanent position became available in the D[PW], the individuals responsible for hiring would generally review the files of the seasonal employees with the longest service to the City.  Each file included a record of attendance and disciplinary actions, if any.  *Usually, but not always, the D[PW] awarded [ ] the permanent appointment to the seasonal employee with the greatest length of service and best work record.*"  *Id.* (italics added).  Accordingly, seasonal laborers, including Plaintiff, "were consistently encouraged to maintain perfect attendance and superior performance with the possibility that they could be put on permanent status eventually."  *Id.* ¶ 6.  Defendant argues Battaglia "explains that appointments to permanent positions are based on merit," Risman Declaration ¶ 93,

that Plaintiff gave deposition testimony agreeing with Battaglia's statements insofar as Battaglia asserted that appointments to permanent positions usually are "based on length of service and work record," *id.* ¶ 94, and that Plaintiff, in his State Department of Human Rights Complaint, alleged his supervisors had advised that "time worked, attendance and quality of service is used to determine eligibility for appointment to a permanent position within the D[PW]." *Id.* ¶ 95.  Defendant's repeated assertions that appointment to permanent laborer positions in the DWP are largely based on length of service and work record as a seasonal laborer, however, is inconsistent with the deposition testimony of Masi, Licata, Floriano, Mayor Brown, and Stepniak, none of whom even remotely implied that consideration was given to a candidate's work history and length of service.  Rather, in their respective deposition testimony, Masi, Licata, Floriano, Mayor Brown, and Stepniak make what is best described as "vague" references to largely relying on, *inter alia*, "background checks" or the civil service office in evaluating candidates. *See, e.g.*, Masi June 9, 2010 Dep. Tr. at 13-14 (explaining that prior to Mayor Brown's administration, Masi regularly participated in selecting candidates for appointment to permanent positions, but had since "been excluded from any participation to that degree or any degree whatsoever . . . . ."); Licata Dep. Tr. at 76-80 (describing her involvement with the hiring process as perusing a candidate's folder to ensure the candidate was "qualified" with regard to medical and criminal history and any residency requirements, although the determination of a candidate's "qualification" for an appointment was otherwise made between HR and the Mayor's Office); Floriano Dep. Tr. at 84-85 (testifying that there is no formal application process for appointment to a permanent laborer position, with recommendations for vacancies often coming from

the relevant department and describing HR's involvement in the appointment process as limited to sending a letter to the department indicating whether a candidate had been approved for hiring); Mayor Brown Dep. Tr. at 45 (testifying that whenever a recommendation for appointment in DPW was made, Casey would make sure "that the department did everything to make sure they had thoroughly looked into the candidate's background to make sure that someone was not being hired that could be a bad worker for the administration."); and Stepniak Dep. Tr. at 13, 36 (admitting he was "familiar with criteria use in the selection process for promotion or hire" yet maintaining Masi was more involved with the hiring decisions).  That Defendant filed in support of summary judgment, with regard to Plaintiff's since withdrawn ADEA claim, a list of those persons who were hired into permanent laborer positions, containing the names and dates of birth, to establish that persons older than Plaintiff were hired for such positions, Barnett Affidavit ¶ 8, but did not include on such list, nor file a new list containing, information as to the asserted relevant criteria, *i.e.*, length of service and work attendance record, raises a question of fact as to whether, if such information were included, the information would support Battaglia's statements with regard to appointment of permanent laborer employees after the commencement of Mayor Brown's administration.

Although Floriano denied that political affiliation or political assistance to Mayor Brown was ever considered by Mayor Brown and Casey when Floriano provided them with the lists of recommended candidates for appointments, but admitted that prior support of the mayor "sometimes" was a consideration, Floriano Dep. Tr. at 65-67, a reasonable jury could find that political affiliation was never considered by Mayor Brown

and Casey because only those who were registered as Democrats, worked politically to support Mayor Brown, or who made financial contributions to Mayor Brown's political campaign were listed as recommended candidates.  Similarly, that Mayor Brown denies knowing, prior to the commencement of the instant action, who Plaintiff was, Brown Dep. Tr. at 10, is consistent with Plaintiff's testimony that Plaintiff's name, because of Plaintiff's political affiliation and failure to make financial contributions to Mayor Brown's political campaign, was never placed on any list of persons recommenced for appointment to a permanent laborer position.

Significantly, none of Defendant's deposed witnesses was able to indicate who made decisions on appointments to vacant positions, including permanent laborer positions to which Plaintiff sought appointment.  Nor has Defendant provided any list of those appointed to permanent laborer positions within the DPW establishing that such appointments have largely been to those seasonal workers with the longest tenure, as Masi maintains was the practice prior to Mayor Brown's first inauguration.  The inconsistency between Masi's assertion that, subsequent to Mayor Brown's first inauguration, Masi was no longer involved in the DPW's hiring decisions, Masi June 9, 2010 Dep. Tr. at 13-14, 103, and Stepniak's testimony that Masi had, following Mayor Brown's inauguration, considerable input into who was appointed to permanent laborer positions, Stepniak Dep. Tr. at 3, 40, 50, creates an ambiguity that must, on summary judgment, be construed in Plaintiff's favor, *McCarthy*, 482 F.3d at 202 (district courts are required on summary judgment to resolve all ambiguities against nonmovant), which, should the jury credit Masi recollection, rather than Stepniak's, is consistent with the reasonable inference to be drawn, *id.*, that reliance on Masi's opinion on new

38

appointments prior to Mayor Brown, was replaced by consideration of political criteria supplied by Floriano at Casey's request as Masi testified.  As with Defendant's failure to provide an affidavit from Casey, who the record shows was centrally involved in the hiring process of permanent laborers, denying political considerations played a substantial role in such decisions, should Casey fail to so testify, a missing witness instruction would permit the jury, as a matter of common sense, to infer that such testimony would be unfavorable to Defendant.

The evidence in the record thus sufficiently establishes genuine issues of material fact from which a reasonable jury could find a causal connection between Plaintiff's minimal participation in Mayor Brown's campaigns and failure to make political donations and Defendant's failure to appoint Plaintiff to a permanent laborer position.


**5.      Nondiscriminatory Reason for Adverse Employment Action**

Defendant maintains that even if Plaintiff can establish a causal connection between his engagement in constitutionally protected activity and Defendant's failure to appoint Plaintiff to a permanent laborer position, summary judgment is still warranted because there are more seasonal workers than vacant permanent laborer positions, Defendant's Memorandum at 25-26.  In opposition, Plaintiff argues Defendant's assertion that Plaintiff would not have been selected for appointment to a permanent laborer position merely raises issues of fact as to whether Plaintiff's lack of political support for Mayor Brown was the reason Plaintiff was repeatedly passed over for such appointment.  Plaintiff's Memorandum at 24-25.  In further support of summary

judgment, Defendant asserts Plaintiff's work attendance record contradicts Plaintiff's

assertion that he was a good employee.  Defendant's Reply Memorandum at 4.

    In support of its argument that Plaintiff would not have been hired regardless of

his engagement in constitutionally protected activity, Defendant filed a list of the 21 days

that Plaintiff was absent "without leave" or "AWOL" from his seasonal laborer position

for the five-year period between January 1, 2006 and January 1, 2011.  Barnett Affidavit

¶ 14; Barnett Affidavit Exh. C.  According to Defendant, Plaintiff's 21 days of AWOL

belie Plaintiff's assertion that he "received positive feedback and recommendations from

his supervisors." Defendant's Reply Memorandum at 4.  Despite Plaintiff's absences

being classified as "AWOL," however, nothing in the record indicates such absences

were considered as disobedient or noncompliant with any work policy.  Indeed, the

pages of Plaintiff's attendance records submitted to document Plaintiff's absences

"without leave" do not show any other type of leave, other than scheduled weekends off,

and one week, July 21 through 25, 2008, for which Plaintiff was "not on payroll" which

presumably was one of the two weeks Plaintiff was laid off each year so as to avoid

being considered a permanent laborer, entitled to significantly higher pay and benefits.

Because Plaintiff does not receive vacation or sick time, that Plaintiff took only 21 days

off, without pay, a reasonable jury could find such absences over a five-year period

does not necessarily suggest Plaintiff had a poor work record that would have counted

against him when recommendations were made for permanent laborer positions; rather,

considering any absence by Plaintiff as "AWOL" is consistent with the fact that Plaintiff,

as a seasonal employee, does not receive vacation days or sick time, such that any

time Plaintiff was unable to report for work could not be recorded on Plaintiff's leave

record as annual leave or sick time.  In fact, Battaglia, who was Plaintiff's supervisor when four of the AWOL absences occurred, considered Plaintiff's work attendance record to be "excellent," and Plaintiff to be a "model employee."  Battaglia Affidavit ¶ 7; Barnett Affidavit Exh. C.

Moreover, Defendant's bare assertion that there were more seasonal laborers than permanent laborer vacancies does not constitute a nondiscriminatory reason for failing to appoint Plaintiff to one of the permanent laborer vacancies.  Such argument ignores Battaglia's recollection that when filling permanent laborer positions within the DPW, "the individuals responsible for hiring would generally review the files of the seasonal employees with the longest service to the City," and the DPW usually awarded "the permanent appointment to the seasonal employee with the greatest length of service and the best work record."  Battaglia Affidavit ¶ 5.  Masi's sworn insistence that "the Mayor's Office identif[ies] individuals that they wish to see hired" with the names of those identified individuals provided to the DPW for processing, Masi's Answers to Plaintiff's Interrogatories Nos. 9 and 10, further demonstrates the feebleness of Defendant's attribution of the failure to hire Plaintiff to a permanent laborer position to the fact that the number of seasonal laborers routinely surpasses the number of  vacant permanent laborer position.

Defendant's argument in support of summary judgment thus fails to establish the absence of any genuine issue of material fact on this point.

## **CONCLUSION**

Based on the foregoing, Defendant's motion for summary judgment (Doc. No. 84), should be DISMISSED as moot in part, GRANTED in part, and DENIED in part.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      January 9, 2014
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn,  474 U.S. 140 (1985); Small v. Secretary of Health and Human Services,  892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited,  838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ Leslie G. Foschio

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        January 9, 2014
              Buffalo, New York