UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM GEORGE,

              Plaintiff,

   -vs-

CITY OF BUFFALO,

              Defendant.
_____

**DECISION and ORDER**
**No. 1:09-cv-00002(MAT)**

# INTRODUCTION

William George ("Plaintiff"), represented by counsel, instituted this action claiming age discrimination and violation of his First Amendment rights by his employer, the City of Buffalo ("the City"). This matter is before the Court upon the Report and Recommendation, dated January 9, 2014, issued by Magistrate Judge Leslie G. Foschio ("the R & R") granting partial summary judgment to the City.

# BACKGROUND

Plaintiff, a seasonal laborer with the City's Department of Public Works, Parks and Streets ("DPW"), commenced this lawsuit in 2009, claiming that the City engaged in age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") because it failed to appointment him to an unspecified permanent position.[1] In 2011, Plaintiff was granted leave to amend his

---

[1] Plaintiff testified at his deposition that he was unsure what permanent position he was seeking. The R&R determined that Plaintiff was seeking a permanent "Laborer II" position, which the City indicates is a non-competitive position, which does not require an examination and is a discretionary appointment.

complaint ("Corrected Amended Complaint") to add a First Amendment political affiliation claim under 42 U.S.C. § 1983 ("Section 1983"), in which Plaintiff alleged that the City failed to appoint him to a permanent position on account of his refusal to change his political affiliation to the Democratic party and provide political support to Mayor Byron Brown.

The City moved for summary judgment in 2012 with regard to both the ADEA and First Amendment claims. Plaintiff thereafter withdrew his ADEA claim but opposed summary judgment as to his First Amendment claim.

The R&R recommended dismissing the City's motion for summary judgment as moot with respect to the ADEA claim; granting the City's motion with respect to Plaintiff's New York State Human Rights Law ("NYSHRL") claim; and denying the City's motion with respect to Plaintiff's First Amendment claim.

The City timely filed objections (Defendant's Objections ("Def's Obj.") (Dkt #98-2). Plaintiff filed a memorandum of law in opposition to Defendant's objections. At the request of the Court (Arcara, D.J.), the parties supplied additional briefing on the Supreme Court's recent decision in Heffernan v. City of Paterson, N.J., 136 S. Ct. 1412 (2016).

**STANDARD OF REVIEW**

"In reviewing the R & R of a dispositive matter from a magistrate judge, the district court 'may adopt those portions of the Report to which no objections have been made and which are not

facially erroneous.'" <u>Nansaram v. City of N.Y.</u>, No. 12-CV-5038 NGG RLM, 2015 WL 5518270, at *2 (E.D.N.Y. Sept. 17, 2015) (quotation and citation omitted); <u>see also</u> FED. R. CIV. P. 72(b), Advisory Comm. Notes (when a party makes no objection, or only general objections to a portion of an R & R, the district judge reviews it for clear error or manifest injustice). An R&R is "clearly erroneous" when the court is, "upon review of the entire record, left with the definite and firm conviction that a mistake has been committed." <u>United States v. Snow</u>, 462 F.3d 55, 72 (2d Cir. 2006).

To preserve a claim for review by the district court, the party must make sufficiently specific objections to the R & R. <u>E.g.</u>, <u>Mario v. P & C Food Mkts., Inc.</u>, 313 F.3d 758, 766 (2d Cir. 2002). When, however, a party makes specific objections, the district judge must undertake a "<u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made[,]" 28 U.S.C. § 636(b)(1)(C), and "may . . . receive further evidence[.]" <u>Id.</u>; <u>see also</u> <u>Grassia v. Scully</u>, 892 F.2d 16, 19 (2d Cir. 1989) (discussing § 636(b)(1)(B)).

## DISCUSSION

### I. Erroneous Finding of a Triable Issue of Fact on the "Protected Activity" Element (Def's Obj. 1)

"To succeed on a First Amendment claim brought pursuant to Section 1983, a plaintiff must be able to demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged

-3-

retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." Wrobel v. Cnty. of Erie, 692 F.3d 22, 27 (2d Cir. 2012) (citation omitted).

Plaintiff maintains that his failure to affirmatively undertake political activity-in essence, his decision to remain apolitical—is constitutionally protected activity. The City, on the other hand, argues that Plaintiff has not engaged in any politically protected activity, *because* he was not politically active. Furthermore, the City notes, Plaintiff *did* volunteer on behalf of Mayor Brown's re-election campaign in the fall of 2009, and on one other date he cannot remember.

The R & R found that there was an issue of fact as to the first element of a First Amendment retaliation claim "insofar as Plaintiff engaged in constitutionally protected activity by refusing to register as a Democrat and refusing to make financial contributions to Mayor Brown's political campaign." (R & R at 22). A "refusal" presupposes some kind of request or demand. However, the City argues, there is no evidence in the record that any City employee demanded or requested Plaintiff change his political affiliation or donate to the mayoral campaign; that any person involved in the Laborer II hiring process was aware of Plaintiff's alleged refusal; or that Plaintiff actually refused to register as a Democrat or make financial contributions to the Mayor's campaign.

(See Def's Obj. at 6 ("Second Circuit precedent makes clear that opting to be apolitical or refusing to provide political support may constitute protected activity, but only if the plaintiff exercises this right in response to pressure to become political or provide support.") (citing Wrobel, 692 F.3d at 29).

In Wrobel, the Second Circuit explained that the First Amendment is "violated when state officials engage in quintessential political patronage[.]" Id. at 27 (collecting cases). And, as the Second Circuit has observed, First Amendment protection "has been extended to politically neutral employees who are treated less favorably than employees politically aligned with those in power[.]" Id. (collecting cases); see also Wrobel v. Cnty. of Erie, 211 Fed. Appx. 71, 72 (2d Cir. 2007) (unpublished opn.) (finding that the plaintiff adequately pled associational conduct (not pledging support for the new administration and choosing not to affiliate himself politically with it); stating that "retaliation for such conduct, if adequately proven, could give rise to Section 1983 liability"). Plaintiff thus is correct that an employee is not stripped of protection under the First Amendment's association clause simply because he chooses to remain apolitical or to not engage in political activism. See generally, Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 (1990) ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its

employees' freedom to believe and associate, or to not believe and not associate.").

The City asserts, however, that in Wrobel, the Second Circuit "cautioned that a plaintiff who was never asked to donate to, volunteer for, or lend support to any political candidate has not, as a matter of law, engaged in protected activity[.]" (Def's Obj. at 6). The Court finds that this statement somewhat misrepresents the passage from Wrobel on which it purports to rely. Specifically, the language the City quotes from Wrobel appears in the Second Circuit's discussion of the causation element of a First Amendment claim. See Wrobel, 692 F.3d at 28 ("The dispositive issue for Wrobel's free association claim is the causal relationship between the association identified [i.e., failure to pledge support to the new administration] and his transfer."). To a certain extent, then, Defendant's First Objection conflates Wrobel's teachings on the protected activity and causation elements in a First Amendment association claim. Accordingly, the Court agrees with Defendant that Plaintiff has failed to establish "causation," as discussed further below in Section II.

**II. Erroneous Finding of a Triable Issue of Fact on the "Causation" Element (Def's Obj. 2)**

Proving causation in a First Amendment association case requires a showing by the plaintiff that his "protected conduct was a substantial or motivating factor[,]" Coogan v. Smyers, 134 F.3d 479, 484 (2d Cir. 1998), on the part of the defendant. The R & R acknowledged that there is no evidence that the City knew who

Plaintiff was or was aware of his political views. Similarly, the R & R did not cite any evidence suggesting that the City failed to appoint Plaintiff to a permanent position *because of* his political beliefs. The R & R instead found that the fact the Mayor and the City's other witnesses did not know who Plaintiff was, actually helped his claim. The R & R surmised that the City could not and would not have known of Plaintiff on account of his failure to provide financial support to the Mayor's re-election campaign. (See R&R at 38 ("[T]hat Mayor Brown denies knowing, prior to the commencement of the instant action, who Plaintiff was, is consistent with Plaintiff's testimony that Plaintiff's name, because of Plaintiff's political affiliation and failure to make financial contributions to Mayor Brown's political campaign, was never placed on any list of persons recommended for appointment to a permanent laborer position.")).

As an initial matter, the Court notes that while Plaintiff did not contribute financially, he did support Mayor Brown's campaign in other ways. In 2009, Plaintiff and his son went to Mayor Brown's campaign headquarters to volunteer. The campaign organizers advised Plaintiff that under New York State's election law, he had to be a registered Democrat in order to circulate designating petitions for Mayor Brown, a Democrat.  The campaign organizers explored other ways Plaintiff could help, and subsequently connected him with a staffer, whom Plaintiff drove around the City while the staffer petitioned for the Mayor. At his deposition, Plaintiff described

the experience as "fun." (Pl's Dep. at 174-75). Plaintiff gave his phone number to the staffer and told him to call him if the staffer needed more help. The staffer did call Plaintiff one other time, but Plaintiff was unavailable due to a prior engagement. No one from the Mayor's re-election campaign contacted Plaintiff after that. (Pl's Dep. at 174-75, 226-27). In addition, on a date he cannot recall, Plaintiff handed out flyers in support of Mayor Brown's re-election campaign after work. (Pl's Dep. at 58-60).

The R & R acknowledged these activities on Plaintiff's part in support of the Mayor's administration, but found that a reasonable jury could conclude they were "interpreted by Defendant as refusing to sufficiently engage in expected political activity required to further Plaintiff's career." (R & R at 22). This finding rests on speculation, since there is no evidence that anyone from the City "interpreted" Plaintiff's conduct to mean anything at all, let alone that he was insufficiently loyal to the current mayoral administration. The R & R relied on the hearsay statement by former DPW administrator Charles Masi ("Masi") that "some people"—who were never identified by Masi—believed appointments were made for political reasons. Later in his deposition, Masi testified that while at the DPW, he had "seen many people who contribute[d] [to political campaigns] not be promoted and some who didn't contribute be promoted." (Masi Dep. at 48). He qualified this by stating that it did not occur "at the employee level, but at the higher levels."

(Id.). However, he could "not factually" give any examples of that occurring at higher levels; he stated that he "formed [his] opinion on hearsay." (Id.). Thus, even accepting Masi's belief, based on hearsay, that patronage was occurring, he stated that he did not observe it at the "employee level," where Plaintiff, a seasonal laborer with the DPW, would have been located in the City's organizational hierarchy.

The Court does not agree that Morin v. Tormey, 626 F.3d 40 (2d 2010), provides support for the R & R's conclusion that Plaintiff met his burden of proof on causation. In Morin, the Second Circuit held that the First Amendment applies to plaintiffs "perceived by those retaliating to be apolitical or insufficiently politically loyal." Id. at 44. The Circuit then applied this principle to a plaintiff who had refused to accede to demands by the defendants to spy on the defendants' political opponents.[2] Here, in contrast, Plaintiff has not pointed to any evidence in the record that any City employee demanded, requested, or suggested that Plaintiff change his political affiliation or donate to the mayoral campaign; that any person involved in the Laborer II hiring

---

[2] In Morin, the plaintiff was an employee of the New York State Unified Court System. Defendants Tormey, a judge, and Voninski, his assistant, demanded that Morin "provide negative information about [Tormey's opponent] Judge Klim with respect to his upcoming judicial election for Supreme Court" and "ordered [her] to 'dish dirt' on Judge Klim." They requested her "to monitor Judge Klim's activities and to report his 'comings and goings.'" Morin replied that it was not her position "to spy on judges during a judicial election" and that "it was repeatedly emphasized to me that I was not to engage in political activity involving the courts." Hearing her response, Tormey and Voninski "became visibly angry," and Tormey "directed [her] to 'get out of [his] office!'" Morin, 626 F.3d at 42 (alterations in original).

process was aware of Plaintiff's alleged refusal; or that Plaintiff actually refused to register as a Democrat or make financial contributions to the Mayor's campaign. Given that there were no demands or requests made to Plaintiff to financially contribute to, or otherwise assist, the Mayor's political campaign, his case thus is distinguishable from Morin.

The Second Circuit's decision in Wrobel provides further support for finding Morin to be inapplicable where, as here, there were no demands or pressures upon Plaintiff to engage in, or increase his current level of, political activism. In Wrobel, the Circuit noted that while "[t]he record [did] support Wrobel's assertion that he did not pledge support for or politically align himself with the Giambra administration[,]" [t]hat association . . . is a non sequitur in the context of this case[,]" because "Wrobel was never asked to donate to, volunteer for, or lend support to any political candidate when Naylon was his supervisor." Wrobel, 692 F.3d at 29. The Second Circuit concluded in Wrobel that the plaintiff had "not sustained his burden at summary judgment of creating a genuine issue of fact as to whether his mistreatment was the result of his lack of political allegiance to the new administration." The Second Circuit explained that "[i]t is not enough for Wrobel to show mistreatment coupled with political abstention—there must be some evidence that the two are related, or an available inference that it is so." However, inferences that are supported by mere "speculation or conjecture will not defeat a

summary judgment motion." McDonald v. Vill. of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004).

In justifying finding an inference of retaliation, the R & R focused extensively on the deposition testimony of various City witnesses regarding the process of identifying individuals to be considered for permanent appointments to the Laborer II position. (See R & R at 23-39). The R & R noted that "[s]ignificantly, none of Defendant's deposed witnesses was able to indicate who made decisions on appointments to vacant positions, including permanent laborer positions to which Plaintiff sought appointment."[3] (R & R at 38). However, this lack of clarity on the part of the City's witnesses does not bear upon, or illuminate, the issue of causation in Plaintiff's case *in particular.*

### III. Erroneous Finding of a Trial Issue of Fact as to Municipal Liability (Def's Obj. 3)

The City is the only defendant in this lawsuit. Accordingly, Plaintiff cannot premise Section 1983 liability on a respondeat superior theory. See Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) ("The Supreme Court has made clear that 'a municipality cannot be made liable' under § 1983 for acts of its employees 'by application of the doctrine of respondeat superior.'") (quotation and citation omitted).

---

[3] Plaintiff acknowledged at his deposition that he had "not applied in writing for any permanent position." (Pl's Dep. at 156).

-11-

In order to prevail on a claim against a municipality under Section 1983 based on acts of a public official, a plaintiff is required to prove the following: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Id. (citation omitted). The "official policy" element "can only be satisfied where a plaintiff proves that a 'municipal *policy* of some nature caused a constitutional tort.'" Id. (quotation omitted; emphasis supplied).

The R & R found that Plaintiff had submitted "sufficient evidence on which a reasonable jury could find that the City's failure to appoint Plaintiff to a permanent laborer position occurred pursuant to a policy promulgated by either Mayor Brown or First Deputy Mayor Steven Casey[.]" (R & R at 14). In support of this finding, the R & R did not rely on Mayor Brown's testimony, and the Deputy Mayor was not deposed in this action. Instead, the R & R relied on the testimony of Masi and former Superintendent of Streets and Sanitation Robert Battaglia ("Battaglia") to conclude that hiring decisions regarding permanent appointments were made by the Mayor's Office, and therefore must have been based on political considerations. (See R & R at 16 ("Masi's attributing the selection of such candidates to the Mayor's Office[ ] establishes the existence of an issue of fact as to whether such appointments were made pursuant to a policy created by the Mayor's Office to favor

-12-

candidates who were active on behalf of Democratic candidates, and especially supportive of Mayor Brown.")). The Court cannot find this conclusion to be supported by anything more than conjecture. The fact that the Mayor's Office, without more, was involved in making employee appointments does not establish a triable issue of fact regarding the existence of a municipality-wide policy of discrimination.

To the extent Plaintiff seeks to hold the City liable for a "single decision by [a] municipal policymaker[ ]," Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986), such a claim fares no better. It is incumbent upon the plaintiff to show that the official had final policymaking authority. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (explaining that "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability"). Here, the Deputy Mayor was not deposed, and there is no basis in the rest of the record to find that he was a policymaker. Even assuming the Mayor was a "policymaker," Plaintiff has failed to raise a triable issue of fact as to causation.

In Praprotnik, 485 U.S. at 127, "a plurality of the Supreme Court made it clear that to hold a municipality liable for the acts of its employees, a plaintiff cannot just prove that the final policymaking authority . . . knew of the adverse action . . . ." Davis v. City of N.Y., 228 F. Supp.2d 327, 341 (S.D.N.Y. 2002) (footnote omitted), aff'd, 75 Fed. Appx. 827 (2d Cir. 2003). "The

plaintiff must also prove that the final policymaking authority knew that the subordinates took that action for unconstitutional reasons." Id. (citing Prapotnik, 485 U.S. at 127) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.")). Here, Plaintiff has not established that either the Mayor or the Deputy Mayor *knew of* Plaintiff at all, much less that he was interested in, and was not given, a permanent Laborer II appointment. To conclude otherwise would require resort to conjecture. Compare with Davis, 228 F. Supp.2d at 341 (overturning jury verdict finding that Safir acquiesced in the complained of conduct because he knew or should have known that his subordinates were acting in a deliberate and retaliatory manner towards Mr. Davis for exercising his First Amendment rights; "[e]ven drawing all inferences in favor of Davis, the evidence only shows that Safir knew: (1) members of the Police Department fired Davis and then refused to reinstate him on the stated grounds that the city's lawyers had concluded Davis had violated the law, (2) the IAB put a hold on his reinstatement for an unstated reason, and (3) Davis, his lawyer, and the Board of Elections believed that Davis had not been a nominee of the Liberal Party and should therefore not have been deemed resigned").

**IV.  The Impact of Heffernan**

The Court finds that the Supreme Court's decision in Heffernan does not support Plaintiff's opposition to Defendant's summary

judgment motion, and does not support the R & R's analysis of the First Amendment claim.

> Heffernan presented the following factual scenario:
>
> In 2005, Jeffrey Heffernan, the petitioner, was a police officer in Paterson, New Jersey. He worked in the office of the Chief of Police, James Wittig. At that time, the mayor of Paterson, Jose Torres, was running for reelection against Lawrence Spagnola. Torres had appointed to their current positions both Chief Wittig and a subordinate who directly supervised Heffernan. Heffernan was a good friend of Spagnola's. During the campaign, Heffernan's mother, who was bedridden, asked Heffernan to drive downtown and pick up a large Spagnola sign. She wanted to replace a smaller Spagnola sign, which had been stolen from her front yard. Heffernan went to a Spagnola distribution point and picked up the sign. While there, he spoke for a time to Spagnola's campaign manager and staff. Other members of the police force saw him, sign in hand, talking to campaign workers. Word quickly spread throughout the force.The next day, Heffernan's supervisors demoted Heffernan from detective to patrol officer and assigned him to a "walking post." In this way they punished Heffernan for what they thought was his "overt involvement" in Spagnola's campaign. In fact, Heffernan was not involved in the campaign but had picked up the sign simply to help his mother. Heffernan's supervisors had made a factual mistake.

Heffernan, 136 S. Ct. at 1416. The district court found that Heffernan had not engaged in any conduct protected by the First Amendment, and, for that reason, the respondents had not deprived him of any constitutionally protected right. The Third Circuit affirmed, stating that "a free-speech retaliation claim is actionable under § 1983 only where the adverse action at issue was prompted by an employee's actual, rather than perceived, exercise of constitutional rights." Id. (quotation omitted).

The Supreme Court reversed. At the outset, it "assume[d] that the activities that Heffernan's supervisors thought he had engaged in are of a kind that they cannot constitutionally prohibit or punish, but that the supervisors were mistaken about the facts. Heffernan had not engaged in those protected activities." Nevertheless, the Supreme Court held, Heffernan's constitutional case did not fail because it was Heffernan's supervisors' allegedly improper motive, based on facts as *they perceived them*, rather his actual activity, that was relevant in determining liability. See Heffernan, 136 S. Ct. at 1418 ("When an employer demotes an employee out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. § 1983—even if, as here, the employer makes a factual mistake about the employee's behavior."). The Supreme Court remanded the case for further proceedings.

This Court finds Heffernan relevant in at least two ways to this case. The first is the Supreme Court's emphasis on the defendant's motive for taking the adverse action, and its caveat that the plaintiff "will have to point to more than his own conduct to show an employer's intent to discharge or to demote him for engaging in what the employer (mistakenly) believes to have been different (and protected) activities." Heffernan, 136 S. Ct. at 1419. Here, in contrast, Plaintiff has pointed to no more than his own conduct, which, as Heffernan makes clear, is insufficient to

prove an improper motive on the part of the City. Second, Heffernan is consistent with Wrobel, discussed at length above, and precedent from other circuits requiring the defendant in a First Amendment association case to have knowledge of the plaintiff's political beliefs and activity (or lack thereof). See Wrobel, 692 F.3d at 32 ("'It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.'") (quoting Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002)); Brown v. Cnty. of Cook, 661 F.3d 333, 336 (7th Cir. 2011) ("The Cook County Sheriff's Office has some 7,000 employees, and Sheahan swears that he never met Brown or had even heard of him before this lawsuit. Sheahan's deputies who were involved in promotions knew Brown but not that he was a Republican. Brown contests all this but produced no admissible evidence to contradict the sworn denials of Sheahan and the members of Sheahan's senior staff. Brown cannot satisfy his burden of showing that his political affiliation was a motivating factor in his being passed over for promotion if he can't even show that people who decided or advised on the decision were aware of his political affiliation."). As discussed above, and in contrast to Heffernan, there is no evidence that any City employee or official with decision-making authority "perceived" or "thought" of Plaintiff as politically neutral or insufficiently politically loyal. Plaintiff's proof as to causation founders on this basis.

**CONCLUSION**

For the reasons discussed above, the Court rejects in part and accepts in part the R&R. The Court rejects the R&R to the extent it recommended denying summary judgment on Plaintiff's First Amendment claim, and accepts the R&R to the extent it found that the summary judgment motion was moot as to Plaintiff's ADEA claim, and dismissed the NYSHRL claim. The Corrected Amended Complaint is dismissed, and the Clerk of Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**

HON. MICHAEL A. TELESCA
United States District Judge

Dated:   January 31, 2017
         Rochester, New York.